IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| MICHAEL SAMUEL DEKELBAUM,<br>Movant,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>Respondent. | No. 4:26-CV-0716-P<br>(4:22-CR-372-P) |

**RESPONSE TO MOTION UNDER 28 U.S.C. § 2255**

Respectfully submitted,

Ryan Raybould
United States Attorney

*/s/ Francisco A. Besosa-Martínez*
Francisco A. Besosa-Martínez
Assistant United States Attorney
P.R. Bar No. 18670
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone: (214) 659-8600
Email: francisco.a.besosa@usdoj.gov

# TABLE OF CONTENTS

Page


TABLE OF AUTHORITIES ........ iv

RESPONSE TO MOTION UNDER 28 U.S.C. § 2255 ........ 1

BACKGROUND ........ 1

1. With the help of a confidential source, law enforcement officers uncover Dekelbaum's participation in the distribution of multi-kilogram quantities of methamphetamine and other controlled substances in the DFW area. ........ 1

2. After being charged with drug conspiracy and having the federal public defender appointed to represent him, Dekelbaum goes through two substitutions of counsel before pleading guilty to conspiracy to possess with intent to distribute a mixture containing a detectable amount of methamphetamine, only to seek a third substitution of counsel and then moving to withdraw his guilty plea. ........ 3

3. At the show cause hearing, the Court, "with great consternation," denies the government's motion to rescind its order granting Dekelbaum's motion to withdraw his guilty plea. ........ 5

4. The Court denies Lassiter's 50-page motion to suppress raising numerous arguments challenging the admissibility of the evidence found at Dekelbaum's residence ........ 7

5. After the government reindicts Dekelbaum with the original drug conspiracy charge—and adds a pair of possession charges—Dekelbaum decides to plead guilty a second time to the same offense to which he had previously pleaded guilty. ........ 9

6. At sentencing, the Court accepts the PSR's factual findings and guideline calculations and imposes a downward-variant sentence of 160 months. ........ 9

7. After the Fifth Circuit affirms the judgment and the Supreme Court denies the petition for writ of certiorari, Dekelbaum timely files a § 2255 motion. ........ 12

**Page**

ARGUMENT AND AUTHORITIES ........ 13

1. Dekelbaum's claims of ineffective assistance against Haffar are meritless. ........ 16

   A. Dekelbaum's claim of ineffective assistance of counsel against Haffar for advising him to plead guilty was rendered moot by virtue of his successful plea withdrawal. ........ 16

   B. Dekelbaum has not shown deficient performance with regards to Haffar's advice that he participate in proffer sessions. ........ 18

   C. Dekelbaum also fails to show prejudice. ........ 19

2. Dekelbaum's claims of ineffective assistance against Lassiter are meritless. ........ 20

   A. Dekelbaum fails to show deficient performance or prejudice with regard to his claim that Lassiter provided ineffective assistance by advising him to enter a second plea agreement after having successfully withdrawn his plea. ........ 20

   B. Dekelbaum fails to show deficient performance or prejudice with regard to his claim that Lassiter provided ineffective assistance by failing to object to the Court's alleged Rule-11 violation. ........ 22

3. Dekelbaum's ineffective-assistance claims against Kuchera are meritless. 24

CONCLUSION ........ 26

CERTIFICATE OF SERVICE ........ 26

## TABLE OF AUTHORITIES

**Federal Cases** **Page(s)**

*Barrett v. United States*, 2019 WL 7284174 (N.D. Tex. Dec. 27, 2019) .......... 18

*Cullen v. Pinholster*, 563 U.S. 170 (2011) .......... 15

*Dekelbaum v. United States*, 145 S. Ct. 2786 (2025) .......... 13

*Hill v. Lockhart*, 474 U.S. 52 (1985) .......... 23

*Kercheval v. United States*, 274 U.S. 220 (1927) .......... 16

*Massaro v. United States*, 538 U.S. 500 (2003) .......... 14

*Miller v. Johnson*, 200 F.3d 274 (5th Cir. 2000) .......... 15

*Moore v. Vannoy*, 968 F.3d 482 (5th Cir. 2020) .......... 24

*Moses v. Davis*, 673 F. App'x 364 (5th Cir. 2016) .......... 24

*Padilla v. Kentucky*, 559 U.S. 356 (2010) .......... 15

*Smith v. Robbins*, 528 U.S. 259 (2000) .......... 15, 24

*Strickland v. Washington*, 466 U.S. 668 (1984) .......... passim

*United States v. Addonizio*, 442 U.S. 178 (1979) .......... 13

*United States v. Ayika*, 554 F. App'x 302 (5th Cir. 2014) .......... 24, 25

*United States v. Capua*, 656 F.2d 1033 (5th Cir. Unit A Sept. 1981) .......... 13

*United States v. Carr*, 740 F.2d 339 (5th Cir. 1984) .......... 4

*United States v. Cronic*, 466 U.S. 648 (1984) .......... 20

*United States v. Davila*, 569 U.S. 597 (2013) .......... 23, 25

*United States v. De Leon*, 915 F.3d 386 (5th Cir. 2019) .......... 22

*United States v. Dekelbaum*, 2025 WL 958278 (5th Cir. Mar. 31, 2025) .......... 12, 13, 18, 19

*United States v. Draper*, 882 F.3d 210 (5th Cir. 2018) .......... 22

**Federal Cases, continued** **Page(s)**

*United States v. Edwards*, 442 F.3d 258 (5th Cir. 2006) ............ 15

*United States v. Escajeda*, 8 F.4th 423 (5th Cir. 2021) ............ 18

*United States v. Frady*, 456 U.S. 152 (1982) ............ 13

*United States v. Green*, 882 F.2d 999 (5th Cir. 1989) ............ 18

*United States v. Hughes*, 635 F.2d 449 (5th Cir. 1981) ............ 16

*United States v. Jackson*, 7 F.4th 261 (5th Cir. 2021) ............ 16

*United States v. Kimler*, 167 F.3d 889 (5th Cir. 1999) ............ 21

*United States v. McDaniels*, 907 F.3d 366 (5th Cir. 2018) ............ 15

*United States v. McKnight*, 570 F.3d 641 (5th Cir. 2009) ............ 17

*United States v. Placente*, 81 F.3d 555 (5th Cir. 1996) ............ 14

*United States v. Reinhart*, 357 F.3d 521 (5th Cir. 2004) ............ 24

*United States v. Shaid*, 937 F.2d 228 (5th Cir. 1991) ............ 13, 14

*United States v. Stewart*, 207 F.3d 750 (5th Cir. 2000) ............ 14

*United States v. Stroher*, 387 F. App'x 508 (5th Cir. 2010) ............ 16

*United States v. Urias-Marrufo*, 744 F.3d 361 (5th Cir. 2014) ............ 17

*United States v. Vaughn*, 955 F.2d 367 (5th Cir. 1992) ............ 14

*United States v. Williams*, 476 F. App'x 1 (5th Cir. 2012) ............ 24

## Federal Statutes and Rules

Fed. R. App. P. 4(c)(1)(A) ............ 13

Fed. R. Crim. P. 11(h) ............ 23

## RESPONSE TO MOTION UNDER 28 U.S.C. § 2255

Michael Samuel Dekelbaum moves to set aside his conviction under 28 U.S.C. § 2255. (CV Nos. 1-2.)[1] He makes four ineffective-assistance-of-counsel claims against three of his attorneys challenging the validity of his guilty plea. (CV No. 2 at 1-11.) Regarding his first attorney, Taly Haffar, Dekelbaum avers that he failed to investigate the facts of the case before advising him to plead guilty and enter into a proffer agreement, thereby giving the government incriminating evidence that prejudiced his defense. Dekelbaum then claims that his second attorney, Mark Lassiter, was ineffective for advising him to plead guilty again despite the alleged prejudice caused by Haffar and for not objecting to the Court's alleged participation and influence over the plea process. Finally, Dekelbaum faults his appellate attorney, John Kuchera, for not raising the purported Rule-11 violation on direct appeal. Because the claims are belied by the record and otherwise meritless, the Court should deny Dekelbaum's § 2255 motion.

## BACKGROUND

### 1. With the help of a confidential source, law enforcement officers uncover Dekelbaum's participation in the distribution of multi-kilogram quantities of methamphetamine and other controlled substances in the DFW area.

In June 2022, a confidential source (CS) told officers with the Highway Patrol Division of the Texas Department of Public Safety (DPS) that he had been buying 226.79 grams of methamphetamine from Dekelbaum every week to every other week for close to

---

[1] "CV No. __" refers to the docket number of this Section 2255 action. "CR No. __" refers to the docket number of the underlying criminal proceeding, *United States v. Dekelbaum*, No. 4:22-CR-372-P (N.D. Tex.). "PSR" refers to the presentence report, which is docketed at CR No. 47-1.

a year. (PSR ¶ 10.) This amounted to a conservative estimate of 5,896.54 grams of methamphetamine. (PSR ¶ 10.)

On August 10, 2022, officers had the CS text Dekelbaum and arrange the purchase of one kilogram of methamphetamine for $5,200. (PSR ¶ 12.) Later that same day, officers conducting surveillance saw Dekelbaum leave his Dallas residence and stop at his mother's house, before heading to another location with an empty backpack. (PSR ¶¶ 13-14.) Two hours later, Dekelbaum left that location and returned to his residence carrying the same backpack—which now looked like it had an item inside—after telling the CS that he was on his way back. (PSR ¶ 15.)

DPS officers gave the CS the $5,200 and followed him to Dekelbaum's residence, where Dekelbaum gave the CS two vacuum-sealed bags containing what DEA laboratory testing later confirmed was 1,003 grams of methamphetamine hydrochloride at 97 percent purity, yielding 972 grams of actual methamphetamine. (PSR ¶¶ 16-17.) Two days later, DPS officers informed the DEA Fort Worth District Office about Dekelbaum's drug trafficking activities in the DFW area involving large quantities of methamphetamine, heroin, cocaine, pills, and dimethyltryptamine (DMT). (PSR ¶ 18.)

On November 15, 2022, DEA officers knocked on Dekelbaum's door with a federal arrest warrant in hand. (PSR ¶ 19.) Although Dekelbaum immediately shut the door upon seeing them, DEA officers entered the residence and arrested him. (PSR ¶ 19.) Inside the residence, officers saw drug paraphernalia that included glass pipes with residue, a baggie containing methamphetamine, and a bottle of a dark liquid substance

believed to be DMT. (PSR ¶ 20.) After Dekelbaum invoked his right to counsel, officers ceased all questioning and took him to the Tarrant County Jail. (PSR ¶ 20.)

Officers subsequently obtained a state search warrant for Dekelbaum's residence, where they recovered 118.4 grams of methamphetamine hydrochloride at 92 percent purity, yielding 108.9 grams of actual methamphetamine, and two tablets containing 0.52 grams of methamphetamine. (PSR ¶¶ 21-23.) They also found currency, coins, jewelry, and minting plates inside a safe. (PSR ¶ 23.)

Thereafter, a second CS (CS2) informed DEA investigators that he, too, had been making weekly purchases of four to five kilograms of methamphetamine from Dekelbaum since mid-2019. (PSR ¶ 24.) A conservative estimate determined that CS2 had purchased from Dekelbaum 102 kilograms of methamphetamine during the second half of 2019 and 152 kilograms of methamphetamine between April and December 2020. (PSR ¶¶ 24-25.) And in 2021, CS2 said that he and Dekelbaum travelled together to purchase one kilogram of methamphetamine from a supplier for $11,000. (PSR ¶ 26.) CS2 had his last face-to-face contact with Dekelbaum in July 2021. (PSR ¶ 26.)

**2. After being charged with drug conspiracy and having the federal public defender appointed to represent him, Dekelbaum goes through two substitutions of counsel before pleading guilty to conspiracy to possess with intent to distribute a mixture containing a detectable amount of methamphetamine, only to seek a third substitution of counsel and then moving to withdraw his guilty plea.**

In December 2022, a federal grand jury returned a one-count indictment charging Dekelbaum with conspiracy to possess with intent to distribute 500 grams or more of a mixture containing methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1) &

(b)(1)(A). (CR No. 14.) The Court initially appointed the federal public defender to represent Dekelbaum. (CR No. 3.) However, in November 2022, the Court granted Dekelbaum's motion to substitute the public defender with Scott Palmer and Russell Turkel as his newly retained counsels. (CR Nos. 12-13.) Thereafter, in January 2023, Dekelbaum moved again to change counsel, this time bringing in Taly Haffar as his fourth attorney of record. (CR Nos. 21-22.)

In July 2023, while represented by Haffar, Dekelbaum decided to plead guilty to a superseding information charging him with conspiracy to possess with intent to distribute a mixture or substance containing a detectable amount of methamphetamine pursuant to a plea agreement. (CR Nos. 31, 38-43, 45.) Simultaneously, Dekelbaum retained a second attorney, Phillip Linder, as co-counsel. (CR No. 34.) The U.S. Probation Officer prepared a PSR. (CR Nos. 47-1.)

In November 2023, however, Dekelbaum filed a third motion to substitute counsel seeking to replace Haffar and have Mark Lassiter appointed as his fifth counsel of record. (CR Nos. 53-54.) The Court granted Dekelbaum's request. (CR No. 57.) Linder remained as co-counsel and filed objections to the PSR. (CR No. 56.)

While represented by Lassiter, Dekelbaum moved to withdraw his guilty plea, which the Court initially granted after consideration of the relevant factors under *United States v. Carr*, 740 F.2d 339 (5th Cir. 1984). (CR Nos. 62, 66.) Because of a clerical error in the Clerk's Office, however, the government had not been able to access Dekelbaum's motion to withdraw. (CR No. 67 at 2.) As such, the government filed a motion to rescind the Court's order and requested an opportunity to respond to

Dekelbaum's motion to withdraw. (CR No. 67.) The Court did not grant the government's motion, but nevertheless issued an order to show cause as to discrepancies between the government's response and Dekelbaum's factual assertions regarding what officers saw and recovered from Dekelbaum's residence. (CR No. 70.)

**3. At the show cause hearing, the Court, "with great consternation," denies the government's motion to rescind its order granting Dekelbaum's motion to withdraw his guilty plea.**

At the show cause hearing, the Court began by accepting Lassiter's explanation that the discrepancies were due to the fact that he did not have all relevant information regarding what officers saw and recovered from Dekelbaum's residence when he filed the motion to withdraw. (CR No. 149 at 6-7.) The Court then moved on to consider arguments regarding Dekelbaum's motion to withdraw his guilty plea. (CR No. 149 at 7.)

In this regard, Lassiter presented body-camera footage from the execution of the arrest warrant at Dekelbaum's residence. (CR No. 149 at 9-10.) While he conceded that the defense would no longer pursue its not-in-plain-view suppression theory, Lassiter nevertheless argued that the body-camera footage revealed a possible suppression issue regarding a violation of the knock-and-announce requirement because officers purportedly failed to properly identify themselves. (CR No. 149 at 10-13.) Lassiter also took aim at the officers' conduct once inside the residence, asserting that they had no justification for conducting a protective sweep after they had arrested Dekelbaum and determined that there was no remaining immediate threat. (CR No. 149 at 13-15.) Lassiter emphasized that he was not asking the Court to rule on these suppression issues,

but rather that it consider these potentially viable suppression issues in allowing Dekelbaum to withdraw his guilty plea. (CR No. 149 at 15.)

Moving on to the *Carr* factors governing plea withdrawals, Lassiter maintained that the circumstances remained substantially the same as when the Court originally granted Dekelbaum's motion to withdraw. (CR No. 149 at 17-18.) Lassiter asserted that Dekelbaum had repeatedly told his prior counsel—Haffar—that he wanted to go to trial and not plead guilty. (CR No. 149 at 19.) And regarding the four to five months that transpired between Dekelbaum's guilty plea and his motion to withdraw, Lassiter chalked this up to the time it took Dekelbaum to retain new counsel and Lassiter's own review of the case and discovery materials. (CR No. 149 at 19-20.)

For its part, the government maintained that the body-camera footage was neither newly discovered evidence nor had it been withheld. (CR No. 149 at 27-34.) As for the *Carr* factors, the government noted that Dekelbaum never asserted actual innocence and had sought to withdraw his plea with significant delay. (CR No. 149 at 35.) The government also maintained that Dekelbaum had received the close assistance of counsel throughout the proceedings and entered a knowing and voluntary guilty plea. (CR No. 149 at 37-38.) Furthermore, the government also pointed out the multiple continuances Dekelbaum had sought and the resources that had already been expended in preparing for sentencing. (CR No. 149 at 37, 44.)

Ultimately, "with great consternation," the Court denied the government's motion to rescind its order granting Dekelbaum's motion to withdraw. (CR No. 149 at 46.) However, the Court warned Dekelbaum about the consequences of his withdrawal,

including the likelihood of a superseding indictment with charges carrying greater statutory exposure, the potential loss of the reduction for acceptance of responsibility, and the fact that the Court may consider the time and resources spent on going to trial if a jury ended up convicting him based on evidence demonstrating clear guilt. (CR No. 149 at 47-48.) Acknowledging those risks, Dekelbaum decided to proceed anyway. (CR No. 149 at 48.)

**4. The Court denies Lassiter's 50-page motion to suppress raising numerous arguments challenging the admissibility of the evidence found at Dekelbaum's residence.**

Shortly after the show cause hearing, the government obtained a superseding indictment reinstating the original charge of conspiracy to possess with intent to distribute 500 grams or more of a mixture containing methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1) & (b)(1)(A). (CR No. 80.) The superseding indictment further added two counts of possession with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(A). (CR No. 80.)

Then, with the assistance of Lassiter, Dekelbaum filed a motion to suppress the evidence, raising various arguments challenging the admissibility of the evidence seized at Dekelbaum's residence. (CR No. 84.) Specifically, Dekelbaum averred that officers: (1) violated the knock-and-announce rule by failing to announce their presence or intent when they initially knocked on his door; (2) violated the Fourth Amendment when they conducted an unlawful search under the guise of a protective sweep incident to his arrest; and (3) obtained the search warrant based on an unlawfully "barebones" affidavit. (CR No. 84.) Moreover, Dekelbaum contended that (4) his proffer agreement was not

knowing or voluntary and that it was, therefore, unenforceable and could not be used against him under the Rules of Evidence. (CR No. 84.) The Court was unpersuaded and denied Dekelbaum's suppression motion. (CR No. 96.)

First, the Court noted that the remedy for a knock-and-announce violation was not the appropriate remedy here, where officers were executing an arrest warrant rather than a search warrant. (CR No. 96 at 2-3.) The Court explained that this was "because the interests protected by the knock-and-announce rule are those of practical *safety* and *privacy*, not necessarily the trial insurance for law enforcement to play by the rules when seizing evidence." (CR No. 96 at 3) (emphasis in original). Meanwhile, the Court explained that the totality of the circumstances—that the search lasted all of 90 seconds, was "incident to an arrest after the suspect answered the door, recognized officers as police, and then attempted to shut it and pretend no one was home," and that officers saw drugs and drug paraphernalia during the sweep—showed that the search was, in fact, a properly limited protective sweep under the Fourth Amendment. (CR No. 96 at 4.) The Court also denied Dekelbaum's "barebones affidavit" challenge to the search warrant because "[t]he affidavit at issue here contained almost no conclusory statements, and indeed named the 'who, what, when, where, and how' of the suspected criminal enterprise." (CR No. 96 at 5.)

Finally, regarding Dekelbaum's proffer agreement, the Court explained that the Rules of Evidence Dekelbaum relied on to argue that his proffer statements could not be used against him "concern the admissibility of statements made in plea negotiations, not proffer meetings." (CR No. 96 at 6.) And his proffer agreement explicitly stated that it

was “not a plea agreement.” (CR No. 96 at 7.) Moreover, the Court found that Dekelbaum’s proffer agreement was knowing and voluntary. (CR No. 96 at 7.) In doing so, the Court noted (1) the plain language of the proffer agreement, as well as (2) Dekelbaum’s education and age, (3) the fact that he had been represented by multiple attorneys throughout the proceedings, and (4) that he had “figured out how to allege a claim for ineffective assistance of counsel in his guilty plea.” (CR No. 96 at 7.)

**5. After the government reindicts Dekelbaum with the original drug conspiracy charge—and adds a pair of possession charges—Dekelbaum decides to plead guilty a second time to the same offense to which he had previously pleaded guilty.**

Once the Court denied Dekelbaum’s motion to suppress, the government obtained a second superseding indictment charging Dekelbaum with the same three offenses as the initial superseding indictment. (CR No. 98.) Rather than continue fighting, Dekelbaum decided to plead guilty to a superseding information charging him with the same offense to which he had previously pleaded guilty, *i.e.*, conspiracy to possess with intent to distribute a mixture or substance containing a detectable amount of methamphetamine, pursuant to a plea agreement that included the same language and provided the same terms and conditions as the first plea agreement. (*Compare* CR Nos. 41, 106.)

Thereafter, the Court adopted the magistrate judge’s report and recommendation and accepted Dekelbaum’s guilty plea. (CR Nos. 108, 110.)

**6. At sentencing, the Court accepts the PSR’s factual findings and guideline calculations and imposes a downward-variant sentence of 160 months.**

The PSR found that Dekelbaum had a base offense level of 38 under USSG § 2D1.1(c)(2), because the offense involved over 90,000 kilograms of converted drug

weight. (PSR ¶ 35.) The PSR then applied a two-level premises enhancement and a three-level reduction for acceptance of responsibility, for a total offense level of 37. (PSR ¶¶ 36-44.) Coupled with a criminal history category of I and the fact that the offense had a statutory maximum of 20 years, Dekelbaum had a guideline sentencing range of 210 to 240 months. (PSR ¶¶ 48, 97.)

Dekelbaum, through Lassiter, raised various objections to the PSR's guideline calculations. (CR No. 118.) Specifically, Dekelbaum challenged the drug quantities attributed to him, objected to the application of the premises enhancement, and averred that he was eligible for both a safety-valve adjustment and a zero-point offender adjustment. (CR No. 118 at 1-14.) These arguments expanded on the arguments presented by Linder in his original objections to the PSR. (CR No. 56.) Based on these objections, Dekelbaum argued that he should have a total offense level of 28 and, with a criminal history category of I, a guideline sentencing range of 78 to 97 months. (CR No. 118 at 14.)

In an addendum, the probation officer considered Dekelbaum's objections and filed an addendum granting him a two-level reduction for being a zero-point offender. (CR No. 119-1.) However, upon reconsideration, the probation officers removed the three-level reduction for acceptance of responsibility after determining that Dekelbaum had not clearly demonstrated acceptance of responsibility because he had since been charged with falsification of drug test results and a valid drug screen later tested positive for methamphetamine and ecstasy. (CR No. 119-1 at 6-7.) Thus, with a new total offense level of 38 and a criminal history category of I, the addendum determined that

Dekelbaum had a guideline sentencing range of 235 to 293 months' imprisonment, which was capped at 240 months by the 20-year statutory maximum sentence. (CR No. 119-1 at 8.) The addendum further noted the impact of Dekelbaum's plea agreement, which limited his sentencing exposure to a sentence of not more than 20 years, rather than having to face a statutory penalty of ten years to life imprisonment if he had proceeded to trial on the three-count superseding indictment. (CR No. 119-1 at 8.)

At sentencing, the Court began by confirming that Dekelbaum had received copies of the PSR and its addendum and that he had reviewed them with his attorney. (CR No. 145 at 7.) The Court then addressed—and overruled—each of Dekelbaum's PSR objections. (CR No. 145 at 7-9.) Therefore, the Court adopted the PSR's factual findings and guideline calculations. (CR No. 145 at 9-10.) Nevertheless, it acknowledged that Dekelbaum had filed a motion for a downward variance and "made some adequate points that [it] should consider as to whether a downward variance would be appropriate in this case." (CR No. 145 at 9, 11.)

After hearing arguments from both of Dekelbaum's attorneys—Lassiter and Linder—the Court agreed to several adjustments that resulted in "a heck of a good deal" for Dekelbaum. (CR No. 145 at 42.) For starters, even though it "was argumentative whether he should have been given those," the Court reinstated the three-level reduction for acceptance of responsibility. (CR No. 145 at 42-44, 51.) This lowered Dekelbaum's total offense level from 38 to 35, resulting in a new guideline sentencing range of 168 to 210 months. (CR No. 145 at 42-44.) Moreover, the Court also agreed "to vary downward off of the level 35" to a total offense level of 34. Thus, although Dekelbaum

started the sentencing hearing with a guideline sentencing range of 235 to 240 months, he ended up facing only a downward variant sentence of "somewhere between 151 and 188 months." (CR No. 145 at 46.) Ultimately, the Court "found that the guidelines did not meet the factors listed in 3553(a)" and imposed a downward variant sentence of 160 months' imprisonment. (CR No. 145 at 48-49, 51.) It further noted that, "even if [it] didn't have the guidelines, that [it] would have felt that 160 months was the appropriate sentence given the facts and circumstances in this case." (CR No. 145 at 51.)

**7. After the Fifth Circuit affirms the judgment and the Supreme Court denies the petition for writ of certiorari, Dekelbaum timely files a § 2255 motion.**

On appeal, while represented by Kuchera, Dekelbaum challenged the superseding information he had pleaded guilty to as "so impermissibly vague that he w[ould] not be able to argue a double-jeopardy violation in any future prosecution," argued that "the record d[id] not contain enough information to correct this deficiency," and contended that "the factual basis supporting his plea was insufficient." *United States v. Dekelbaum*, No. 24-10537, 2025 WL 958278, at *1 (5th Cir. Mar. 31, 2025), *cert. denied*, 145 S. Ct. 2786 (2025). He also "raise[d] three separate challenges involving the calculation of his sentence: (1) the district court erred by refusing to allow oral argument on his objections to the presentence report (PSR); (2) the district court erred by basing the determination of drug quantity on information from unreliable sources; and (3) the district court erred by refusing to grant a two-level 'safety valve' reduction." *Id.* at *2.

The Fifth Circuit concluded that Dekelbaum's appellate waiver barred all his arguments, except for his unpreserved challenge to the sufficiency of the factual basis

supporting his plea. *Id.* at *1-2. However, after consulting the record, the Fifth Circuit concluded that Dekelbaum had not shown that the Court committed a clear and obvious error in accepting the plea. *Id.* at *1. Thus, the Fifth Circuit affirmed the judgment and sentence. Id. at *2.

Dekelbaum filed a petition for writ of certiorari, which the Supreme Court denied on June 6, 2025. *See Dekelbaum v. United States*, 145 S. Ct. 2786 (2025). One year later, Dekelbaum timely filed the instant § 2255 motion by depositing it in the prison mailing system on June 6, 2026. (CV Nos. 1 at 12.) *See* Fed. R. App. P. 4(c)(1)(A).

## **ARGUMENT AND AUTHORITIES**

### **Standard of Review**

After conviction, the Court is "entitled to presume" that a defendant "stands fairly and finally convicted." *United States v. Frady*, 456 U.S. 152, 165 (1982); *United States v. Shaid*, 937 F.2d 228, 231-32 (5th Cir. 1991) (en banc). "It has, of course, long been settled law that an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *United States v. Addonizio*, 442 U.S. 178, 184 (1979). Moreover, § 2255 "does not offer recourse to all who suffer trial errors." *United States v. Capua*, 656 F.2d 1033, 1037 (5th Cir. Unit A Sept. 1981), and "may not do service for an appeal," *Frady*, 456 U.S. at 165. Thus, the issues that can be presented in a § 2255 motion are limited.

Under § 2255, a prisoner may move the convicting court to vacate, set aside, or correct his conviction or sentence if it was imposed in violation of the Constitution or the laws of the United States. In other words, a defendant can challenge his conviction or

sentence after it is presumed final on issues of constitutional or jurisdictional magnitude only. *Shaid*, 937 F.2d at 232. Section 2255 provides four such grounds: "(1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose the sentence; (3) the sentence exceeds the statutory maximum sentence; or (4) the sentence is otherwise subject to collateral attack." *United States v. Placente*, 81 F.3d 555, 558 (5th Cir. 1996). The Fifth Circuit has stated:

> Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice. Nonconstitutional claims that could have been raised on direct appeal, but were not, may not be asserted in a collateral proceeding.

*United States v. Vaughn*, 955 F.2d 367, 368 (5th Cir. 1992) (citations omitted).

Ineffective-assistance-of-counsel claims are constitutional claims that can be raised under § 2255. *Massaro v. United States*, 538 U.S. 500, 504 (2003). Under the two-prong test established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the prisoner must prove that his attorney's performance was constitutionally deficient and that he suffered actual prejudice as a result. The claim fails if the prisoner does not satisfy either one of the *Strickland* prongs. *United States v. Stewart*, 207 F.3d 750, 751 (5th Cir. 2000).

Under the performance prong, the movant must overcome the "strong presumption that counsel's conduct [was] within the wide range of reasonable professional assistance" by identifying specific acts or omissions that were not the result of reasonable professional judgment. *Strickland*, 466 U.S. at 689-90. The court "must judge the

reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.*

Meanwhile, under the prejudice prong, the movant must show that, "but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694 (internal quotation marks and citation omitted). "That requires a substantial, not just conceivable, likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011).

When applying *Strickland* to appellate counsel, a defendant must show that his counsel "unreasonably failed to discover nonfrivolous issues to appeal" and that "but for his counsel's unreasonable failure to file a merits brief [or raise a particular argument], he would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000).

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). Hence, simply making "conclusory allegations" of deficient performance and prejudice is insufficient to meet the *Strickland* test. *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000).

Finally, § 2255 motions do not automatically require a hearing. *See United States v. Edwards*, 442 F.3d 258, 264 (5th Cir. 2006); *see also* Rule 8 of the Rules Governing Section 2255 Proceedings. No evidentiary hearing is needed if the movant's showing consists of mere "conclusory allegations," "or is otherwise inconsistent with the bulk of his conduct." *United States v. McDaniels*, 907 F.3d 366, 370 (5th Cir. 2018). "When the files and records of a case make manifest the lack of merit of a section 2255 claim, the

trial court is not required to hold an evidentiary hearing." *United States v. Hughes*, 635 F.2d 449, 451 (5th Cir. 1981).

**Discussion**

**1. Dekelbaum's claims of ineffective assistance against Haffar are meritless.**

Dekelbaum's contention that Haffar failed to investigate the facts of the case before advising him to enter into a proffer agreement and plea agreement is unavailing. As this Court noted in its denial of Dekelbaum's motion to suppress, (CR No. 96 at 6-7), these are two distinct agreements with different consequences. And Dekelbaum cannot show deficient performance or prejudice as to either of them.

**A. Dekelbaum's claim of ineffective assistance of counsel against Haffar for advising him to plead guilty was rendered moot by virtue of his successful plea withdrawal.**

Dekelbaum's contention that Haffar failed to investigate the facts of the case before advising him to plead guilty became moot when the Court granted Dekelbaum's motion to withdraw his guilty plea. "The effect of the court's order permitting the withdrawal was to adjudge that the plea of guilty be held for naught." *Kercheval v. United States*, 274 U.S. 220, 224 (1927). As the Fifth Circuit has repeatedly recognized, ineffective-assistance-of-counsel claims become moot when a defendant has received the relief that the claim could provide. *See, e.g.*, *United States v. Jackson*, 7 F.4th 261, 264 n.1 (5th Cir. 2021) (stating that the defendant's ineffective-assistance claim was moot because the Court had vacated the conviction); *United States v. Stroher*, 387 F. App'x 508, 510 (5th Cir. 2010) (stating that the defendant's ineffective-assistance-at-trial claim was moot because the defendant was granted a new trial). Because this Court permitted

Dekelbaum to withdraw his guilty plea—and from his first plea agreement—his attacks on Haffar's performance regarding that agreement are moot.

They are also meritless. The fact that this Court concluded that Dekelbaum had lacked "close assistance of counsel" when it granted his motion to withdraw his guilty plea does not alter the result. Indeed, the Fifth Circuit has distinguished the "close assistance of counsel" analysis applicable to motions to withdraw guilty pleas from the constitutional inquiry governing ineffective assistance of counsel. *See United States v. McKnight*, 570 F.3d 641, 646 (5th Cir. 2009); *United States v. Urias-Marrufo*, 744 F.3d 361, 365-66 (5th Cir. 2014). Moreover, in making its determination that Dekelbaum did not receive "close assistance of counsel," the Court emphasized that it was not "speaking to the quality of legal services offered by [his] counsel" and was not assessing the accuracy of Dekelbaum's complaints. Rather, the Court's *Carr* analysis was based on the fact that Dekelbaum subjectively "felt like" he did not have a close relationship with Haffar. (CR No. 66 at 9.) Thus, the Court's decision to permit the withdrawal of the original plea did not relieve Dekelbaum of his burden under *Strickland*.

In short, by granting Dekelbaum's request to withdraw his plea, the Court restored him to the position he was in prior to pleading guilty. Accordingly, because any alleged prejudice stemming from the first guilty plea was cured, Dekelbaum's ineffective-assistance claim against Haffar for advising him to plead guilty is moot.

### B. Dekelbaum has not shown deficient performance with regards to Haffar's advice that he participate in proffer sessions.

Furthermore, while withdrawal of the guilty plea did not eliminate Dekelbaum's proffer agreement, Dekelbaum cannot show that Haffar acted unreasonably in recommending that he enter a proffer agreement. "A movant who claims that his counsel was ineffective due to a failure to investigate must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the case." *Barrett v. United States*, No. 4:16-CR-132-A, 2019 WL 7284174, at *3 (N.D. Tex. Dec. 27, 2019) (citing *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989)). Moreover, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

Here, Dekelbaum relies on an overly broad reading of *United States v. Escajeda*, 8 F.4th 423, 426-28 (5th Cir. 2021), to contend that Haffar should have recognized before the proffers that the original conspiracy charge was legally defective because the controlled transactions he was involved in were with government informants. (CV No. 2 at 3.) But when he raised this claim in his direct appeal, the Fifth Circuit did not apply Dekelbaum's broad reading of *Escajeda*. In fact, the Fifth Circuit relied on *Escajeda* in rejecting Dekelbaum's claim. *See Dekelbaum*, 2025 WL 958278, at *1. And in

affirming Dekelbaum's conviction, the Fifth Circuit noted, as it had in *Escajeda*, that the record here established (1) "that Dekelbaum made multiple sales to several different individuals;" (2) "contain[ed] other evidence supporting the existence of a drug distribution conspiracy, such as multiple and regular sales of large amounts to the same individuals, distribution materials, sizeable amounts of cash, and multiple cellular telephones;" and (3) "that Dekelbaum conspired with others who did not later become confidential sources for the Government." *Id.* Thus, the fact that this case involved the use of confidential sources, in and of itself, does not establish that Haffar failed to identify a dispositive defense to the conspiracy charge.

Furthermore, the later discovery of additional body-camera footage does not show deficient performance. Under *Strickland*, 466 U.S. at 689, counsel's performance is evaluated from counsel's perspective at the time of the alleged deficient performance, not in hindsight. Thus, the after-the-fact additional discovery of body-camera footage does not show that Haffar knew or reasonably should have known that the material existed. More importantly, Dekelbaum fails to explain how the body-camera footage would have altered Haffar's legal assessment of whether he should enter a proffer agreement. Thus, Dekelbaum has failed to show that Haffar was ineffective in advising him to do so.

Accordingly, Dekelbaum's ineffective-assistance claim against Haffar regarding the proffer agreement fails under the *Strickland* performance prong.

### C. Dekelbaum also fails to show prejudice.

In any event, Dekelbaum's claim also fails to overcome the *Strickland* prejudice prong. As an initial matter, his attempt to side-step his burden under the prejudice prong

by relying on *United States v. Cronic*, 466 U.S. 648 (1984), is misplaced. Under *Cronic*, a presumption of prejudice applies only in narrow, extraordinary circumstances. Dekelbaum's failure-to-investigate claim, however, is a conventional *Strickland* allegation, not one of the exceptional circumstances where *Cronic* presumes prejudice. And the record shows that, far from having suffered an actual or constructive denial of counsel, Dekelbaum was represented by counsel throughout the proceedings. Thus, Dekelbaum must show a reasonable probability that, absent Haffar's purportedly deficient advice, the results of the criminal proceedings would have been different. That he cannot do.

Boiled down to its essence, Dekelbaum's argument is that, but for the proffers, he would have had a viable path to acquittal. But as already explained, his faulty-indictment theory had no merit. Beyond that, the independent evidence the government had showing his drug trafficking ties, even before his proffers, was substantial. Accordingly, Dekelbaum cannot show any prejudice stemming from his participation in the proffers.

**2. Dekelbaum's claims of ineffective assistance against Lassiter are meritless.**

**A. Dekelbaum fails to show deficient performance or prejudice with regard to his claim that Lassiter provided ineffective assistance by advising him to enter a second plea agreement after having successfully withdrawn his plea.**

Dekelbaum's contention that Lassiter rendered ineffective assistance by advising him to enter into a subsequent plea agreement after having successfully withdrawn his original guilty plea is unavailing. Indeed, his argument—that Haffar's earlier advice to participate in proffer interviews had irreparably harmed his defense and thereby rendered

Lassiter's later plea advice ineffective—is largely derivative of his claim against Haffar. Thus, because Dekelbaum has failed to show that Haffar rendered constitutionally ineffective assistance, *see supra*, Discussion, Part 1, the claim against Lassiter suffers the same fate.

In any event, *Strickland* does not recognize ineffectiveness-by-proxy, *i.e.*, establishing ineffective assistance by attributing to Lassiter the consequences of Haffar's allegedly deficient representation. *Strickland*, 466 U.S. at 690 (stating that a defendant must identify the acts or omissions of counsel" that were allegedly deficient). Dekelbaum must still show that Lassiter himself engaged in objectively unreasonable conduct that resulted in prejudice. *Id.* The record, however, demonstrates the opposite.

Shortly after being named substitute counsel, Lassiter successfully argued for the withdrawal of Dekelbaum's guilty plea and filed a 50-page suppression motion raising the very arguments that Dekelbaum avers Haffar had neglected. He further represented Dekelbaum at the suppression hearing. That Lassiter's suppression arguments proved unsuccessful does not mean that his performance was deficient and resulted in prejudice. *See United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument thus cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue"). And it was only after the Court denied the suppression motion, when all that was left was to decide whether to plead guilty or proceed to trial, that Lassiter advised Dekelbaum to plead guilty after successfully negotiating a new plea agreement that preserved the benefits of the original bargain.

Thus, Dekelbaum was able to plead guilty to the same charge contemplated in the original plea agreement despite the fact that the government had brought additional charges after the plea withdrawal.

Accordingly, when it comes to Lassiter's advice to Dekelbaum that he plead guilty, Dekelbaum cannot satisfy either *Strickland* prong.

**B. Dekelbaum fails to show deficient performance or prejudice with regard to his claim that Lassiter provided ineffective assistance by failing to object to the Court's alleged Rule-11 violation.**

The same holds true with regard to Dekelbaum's assertion that Lassiter was ineffective for failing to object when the Court allegedly participated in the plea process in violation of Rule 11(c)(1). Far from having meddled in the plea negotiations, what the record shows is that when Dekelbaum was seeking to withdraw his original guilty plea, the Court admonished him about the possible consequences of doing so just to raise frivolous arguments. At no time did the Court comment or inject itself in ongoing or later plea negotiations. *See United States v. De Leon*, 915 F.3d 386, 390-91 (5th Cir. 2019) ("In assessing a claim of improper judicial participation, we consider 'whether the court was actively evaluating a [defendant's decision to plead guilty], as the court is required to do, rather than suggesting what should occur or injecting comments while the parties are still negotiating'") (quoting *United States v. Draper*, 882 F.3d 210, 216 (5th Cir. 2018)). Because the Court did not violate Rule 11, Dekelbaum cannot show that his counsel should have raised a frivolous claim that it did.

But even assuming that a Rule 11(c)(1) objection was warranted, Dekelbaum still cannot establish a reasonable probability that, but for counsel's failure to object, he would

not have pleaded guilty and instead proceeded to trial. *See Strickland*, 466 U.S. at 694 (1984); *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *United States v. Davila*, 569 U.S. 597, 609–12 (2013) (explaining that, rather than automatic vacatur for a Rule-11 violation based on judicial participation in plea discussions, the relevant inquiry is whether the violation affected the defendant's decision to plead guilty); *see also* Fed. R. Crim. P. 11(h) (stating that "a variance from the requirements of this rule is harmless error if it does not affect substantial rights"). Dekelbaum cannot make that showing.

Here, the Court's comments came at the time Dekelbaum withdrew his original guilty plea and did not immediately result in the second guilty plea. It was only after Dekelbaum vigorously litigated—and lost—his suppression claims that he entered his second guilty plea. By that time, Lassiter had investigated the case, successfully challenged the original guilty plea, filed a lengthy suppression motion raising the arguments Dekelbaum said Haffar had missed, represented Dekelbaum at the suppression hearing, and, after the suppression motion was denied, evaluated the government's evidence and Dekelbaum's trial exposure. Against this backdrop, Dekelbaum's assertion that it was the Court's comments at the *Carr* hearing that led him to plead guilty does not establish a reasonable probability that he would have rejected the plea and proceeded to trial if Lassiter had raised a contemporaneous objection.

Accordingly, Dekelbaum has failed to show that Lassiter's failure to object to the Court's comments was objectively unreasonable or that it resulted in prejudice.

**3. Dekelbaum's ineffective-assistance claims against Kuchera are meritless.**

Finally, Dekelbaum's contention that Kuchera rendered ineffective assistance on appeal by failing to challenge the Court's alleged participation in the plea process under Rule 11(c)(1) fails to overcome the *Strickland* test. The Sixth Amendment does not require that appellate counsel raise every non-frivolous issue for review. *United States v. Reinhart*, 357 F.3d 521, 525 (5th Cir. 2004). Rather, appellate counsel should present meritorious arguments based on directly controlling precedent. *Id.* So, when assessing appellate counsel's conduct, this Court must "first assess whether counsel failed to raise a nonfrivolous issue that was clearly stronger than the issues raised on appeal." *Moore v. Vannoy*, 968 F.3d 482, 489 (5th Cir. 2020) (citing *Robbins*, 528 U.S. at 288 (2000)). In addition, Dekelbaum must show a reasonable probability that, had Kuchera raised this claim, he would have prevailed on appeal. *See Robbins*, 528 U.S. at 285; *Moses v. Davis*, 673 F. App'x 364, 369 (5th Cir. 2016). That he cannot do.

For starters, Dekelbaum makes no argument that the claim Kuchera chose not to raise was comparatively stronger than the claims Kuchera chose to raise. Thus, his claim fails. *See United States v. Williams*, 476 F. App'x 1, 1 (5th Cir. 2012). What's more, Dekelbaum is wrong that Kuchera should have raised a Rule-11 claim. Because Dekelbaum did not raise a Rule-11 objection in the district court, any review on appeal would have been for plain error only. *See United States v. Ayika*, 554 F. App'x 302, 304–05 (5th Cir. 2014). Based on the record and standard of review, Dekelbaum could not succeed on appeal.

First, as already explained, *see supra*, Discussion, Part 2(B), the Court did not commit a Rule 11(c) violation by participating or intervening in plea negotiations. Second, even if there had been a Rule 11(c) violation, Dekelbaum did not immediately enter a plea after the Court's comments. Instead, Lassiter investigated the case and thereafter strongly litigated a motion to suppress. And Dekelbaum pleaded guilty again only after the Court denied his suppression motion. Those intervening events and proceedings undermine Dekelbaum's assertion that the Court's earlier comments caused his decision to plead guilty. This means that, with regard to an unpreserved challenge to the Court's alleged Rule 11 violation, Dekelbaum would have been unable to show either that the Court's comments constituted clear or obvious error or a reasonable probability that, but for those comments, he would not have pleaded guilty and instead gone to trial. *See Ayika*, 554 F. App'x at 306-07; *United States v. Davila*, 569 U.S. 597, 608–12 (2013).

Accordingly, Dekelbaum cannot show deficient performance or any resulting prejudice as a result of Kuchera's failure to raise a Rule 11(c) challenge on direct appeal.

## CONCLUSION

For all these reasons, Dekelbaum's arguments are unavailing, and this Court should deny his § 2255 motion.

Respectfully submitted,

Ryan Raybould
United States Attorney

*<u>/s/ Francisco A. Besosa-Martínez</u>*
Francisco A. Besosa-Martínez
Assistant United States Attorney
P.R. Bar No. 18670
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone: (214) 659-8600
Email: francisco.a.besosa@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on October 8, 2026, I filed this response with the clerk of court for the U.S. District Court, Northern District of Texas. I also certify that a copy of this response was sent to Michael Samuel Dekelbaum, Register Number 31893-510, FCI Seagoville, P.O. Box 9000, Seagoville, Texas 75159, by certified mail.

*<u>/s/ Francisco A. Besosa-Martínez</u>*
Francisco A. Besosa-Martínez
Assistant United States Attorney